UNITED STATES *v.* BIGELOW-HARTFORD CARPET CO. (No. 2806) [1]

United States Court of Customs Appeals, April 16, 1927

*Charles D. Lawrence,* Assistant Attorney General, for the United States.
*Waterhouse & Lockett (Joseph F. Lockett* of counsel) for appellee.

[Oral argument January 31, 1927, by Mr. Lawrence and Mr. Lockett]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

BARBER, Judge, delivered the opinion of the court:

Certain wool known as B. A. 6's was imported, in the grease, from South America, under the Tariff Act of 1922. It will hereinafter be referred to as Exhibit 1. B. A. means Buenos Aires and 6 means the grade of wool. There are six grades of that kind of wool, No. 1 being the finest and best quality, No. 6 the coarsest and poorest. The collector assessed the importation under paragraph 1102 of the act at 31 cents per pound of clean content. Importer claims assessment under paragraph 1101 of the act at 12 cents per pound.

The respective paragraphs are as follows:

PAR. 1101. Wools, not improved by the admixture of merino or English blood, such as Donskoi, native Smyrna, native South American, Cordova, Valparaiso, and other wools of like character or description, and hair of the camel, in the grease, 12 cents per pound; washed, 18 cents per pound; scoured, 24 cents per pound. The duty on such wools imported on the skin shall be 11 cents per pound: * * *

PAR. 1102. Wools, not specially provided for, and hair of the Angora goat, Cashmere goat, alpaca, and other like animals, imported in the grease or washed, 31 cents per pound of clean content; imported in the scoured state, 31 cents per pound; imported on the skin, 30 cents per pound of clean content.

Paragraph 1101 also contains provisions that the duty on wools thereunder may be refunded if entered in bond and used in the manufacture of rugs, carpets, or any other floor coverings.

[1] T. D. 42156.

Importer protested the assessment. At the hearing before the Board of General Appraisers, now the United States Customs Court, seven witnesses were called on each side, and the printed record contains some 360 pages of testimony. The protest was sustained by a majority of the board, one member dissenting.

The Government, appealing, contends here that under the provisions of paragraph 1101 it was incumbent upon the importer to establish a negative and an affirmative—the negative, that the wool in question was not improved by the admixture of merino or English blood; the affirmative, that the importation consisted of wool such as Donskoi, native Smyrna, native South American, Cordova, Valparaiso, or wool of like character or description to those enumerated in the paragraph, and that the evidence does not establish any of such necessary facts.

Two opinions were rendered by the majority of the court below. Brown, J., found that the importation was inferior in grade and quality to the wools mentioned in paragraph 1101. He assumed, for the purposes of the case, without deciding, that it was in whole or in part of English blood, and also found it unnecessary to decide whether or not it was native South American wool. He found that it was, with one exception, lower in grade "than any wool grown in the world," lower than any wool grown in the United States, and, as matter of law, held that it was not improved within the meaning of paragraph 1101 by the admixture of merino or English blood.

Sullivan, J., concurring, found that the wool was a native of South America, and that it had not been improved by the admixture of merino or English blood. In connection therewith he stated that the evidence showed that no witness had testified it was improved wool, but all said it was the lowest grade.

McClelland, J., held that the quality of the wool was of no consequence, but it being established as, in substance, he found that the sheep which produced it possessed a strain of English blood (Lincoln) it followed, as matter of law, that it was improved within the meaning of paragraph 1101. He did not challenge the correctness of the findings of his associates that it was one of the lowest types of wool grown.

In view of these findings and conclusions below and of the Government's contention here, we think the important question is the meaning of the expression in the paragraph, "wools, not improved by the admixture of merino or English blood." As to that, the Government insists in effect that if any inferior native sheep of any country is crossed with a blooded sheep, such as the English Lincoln in this case, the wool produced by the progeny of such cross and by succeeding generations thereof is improved wool as matter of law, regardless of the fact that in the course of time such wool by the

degeneration of the breed, different cross breedings, or other conditions is, in fact, reduced to the lowest class of wool produced.

We are unable to adopt that view. The language of the statute is "wools, not improved by merino or English blood," the meaning of which is too plain to require much interpretation. To improve wool within paragraph 1101 means to raise its quality by crossing the sheep producing it with a superior breed, such as the merino or sheep of English blood. So long as the progeny, direct or remote, of such cross produces as the result thereof a better quality of wool than that produced before the cross by the inferior breed, it is wool improved by such admixture of superior blood. When that result ceases, the wool is no longer improved.

Counsel on both sides refer to previous tariff acts as furnishing support for their differing contentions as to what is improved wool under paragraph 1101. Therefrom it appears that in the tariff acts of 1867, 1883, 1890, 1897, and 1909 Congress had divided wool for tariff purposes into three classes, and in some of the later acts provided that the Secretary of the Treasury should establish and preserve samples of wool of the different classes to be used as standards for comparison in the classification of imported wools. December 20, 1900, such samples were established by the Secretary of the Treasury. See T. D. 22681. The act of 1913 gave free entry to all wools and the present act makes no provision for the establishment or use of such standard samples. The act of 1909, paragraph 363, defined the third class of wools which thereunder took the lowest rate of duty as follows:

Class 3, that is to say: Donskoi, native South American, Cordova, Valparaiso, native Smyrna, Russian camel's hair and all such wools of like character as have been heretofore usually imported into the United States from Turkey, Greece, Syria, and elsewhere, excepting improved wools hereinafter provided for.

Paragraph 365 provided that—

Whenever wools of class 3 shall have been improved by the admixture of merino or English blood, from their present character as represented by the standard samples now or hereafter to be deposited in the principal customhouses of the United States, such improved wool shall be classified for duty either as class 1 or as class 2, as the case may be.

These paragraphs were practically reenactments of provisions of both the acts of 1890 and 1897.

The provisions in these paragraphs, we think, are significant and clearly tend to support our view as to what is meant by improved wools. It will be noted that therein it is provided that they shall have been improved *from their present character* as represented by the standard samples.

In the trial below standard samples of class 3, established by the Secretary of the Treasury under the preceding acts, were presented

in evidence and numerous witnesses asked to compare the quality of the same with the quality of Exhibit 1. The consensus of opinion clearly was that Exhibit 1 was inferior in quality thereto. Samples of wool representing Cordova, native Smyrna, and Valparaiso were also introduced in evidence and by witnesses compared with Exhibit 1, with the result that they were also found to be superior to that exhibit.

The Government does not dispute this, but concedes that Exhibit 1 is lower in grade and price than any enumerated in paragraph 1101.

It contends, however, that this fact establishes that Exhibit 1 is not "other wools of like character and description." In other words, that because it is inferior it is not of like character or description and should, therefore, take a higher rate of duty.

We are unwilling to adopt this view. So far as the prior acts throw light upon the question, they support our conclusion. A lucid and logical exposition of the purpose of Congress in providing for standards of wool in the act of 1890 is to be found in the case of *Lyon* v. *Marine*, 55 Fed. 964, in which the Circuit Court of Appeals said:

The policy of Congress was as simple as obvious. The finest grades of wool of short fiber, represented by the fleeces of the merino sheep and the sheep bred originally on the several downs of England, and the sheep of the other countries named in paragraph 376, are taxed 11 cents a pound. Wools of long fiber, from improved Cotswolds and like highly bred sheep, and the fine hairs of camels, alpacas, and goats of high breed, most of them exceeding in value the fine wools of the merino class are subjected to the higher duty of 12 cents. Finally, wools and hairs from the sheep described in paragraph 378, all more or less inferior in value to those of classes 1 and 2, most of them known commercially to be almost as cheap in value and inferior in quality as the repulsive stuff filed as exhibits in this case, are subjected to an ad valorem duty equal to one-third their market value, whatever that may be. In accordance with this obvious policy of the tariff act of 1890, we are of opinion that the cheap stuff which is the subject of this litigation is not liable to the tax imposed upon the most valuable wools and hairs known to commerce, but is liable to the duty of 32 per cent ad valorem imposed upon all inferior wools and hairs sold in the markets at the lowest range of prices.

The majority of the court below having found that Exhibit 1 is either a native South American wool or is within the term "other wools of like character or description," we think the fact that it is inferior to the latter does not exclude it from classification under paragraph 1101, especially in view of the case just cited.

The reiterated *argument* of the Government that because there is a strain of Lincoln blood in the sheep that produced the wool typified by Exhibit 1 it must necessarily be improved wool is completely refuted by the *fact* that any improved condition of the wool which may have been produced by the admixture of the Lincoln blood is not found in the importation here involved. If Congress had in-

.tended that wool produced by sheep possessing any English blood should be excluded from paragraph 1101, it were easy to have said so, but it did not.

No witness professed to have any actual knowledge as to the breeding of the sheep which, in fact, produced this imported wool. Their opinion as to that was based upon an examination of the wool itself, which when done by experts such as testified seems to be accepted as a sufficient basis for their conclusion as to such breeding.

The case was evidently considered with much care by the Customs Court. We have examined the entire record, find no error in the judgment below, and it is therefore *affirmed*.