UNITED STATES *v.* STONE & DOWNER CO. ET AL. (No. 3010 [1])

United States Court of Customs Appeals, April 12, 1928

*Charles D. Lawrence*, Assistant Attorney General (*Ralph Folks*, special attorney, of counsel), for the United States.

*Walter Evans Hampton* for appellee.

*Barnes, McKenna & Halstead* (*Albert MacC. Barnes, jr.*, and *Samuel M. Richardson* of counsel) *amicus curiae.*

[Oral argument February 14, 1928, by Mr. Lawrence, Mr. Hampton, and Mr. Barnes]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

This appeal involves the proper classification of a large number of importations of so-called asbestos shingles, entered at various ports.

[1] T. D. 42732.

These goods were, in each case, classified as manufactures of asbestos under paragraph 1401 of the Tariff Act of 1922. The importer protested, claiming free entry for the goods, as shingles, under paragraph 1660 of said act. The protests were consolidated and so heard by the Customs Court.

On the hearing before the Customs Court the Government offered in evidence the record in *Hampton, jr., & Co.* v. *United States*, 12 Ct. Cust. Appls. 490, T. D. 40695, and, in addition thereto, a large number of witnesses were called by each party, in an attempt to prove or disprove a commercial designation of the word "shingles" sufficient to include the imported merchandise. The Customs Court, relying largely upon the supposed authority of the *Hampton* case, *supra*, admitted such testimony as to commercial designation, and, finding that such commercial designation had been established, sustained the several protests. From that judgment the Government has appealed.

In *Hampton, jr., & Co.* v. *United States, supra*, we had under consideration the classification of articles identical with those now before us. No claim of commercial designation was made in that case, and the case went off upon the common designation of the word "shingles." Attention is called by appellee to our language in the opinion filed therein:

In order to have their goods admitted free, the appellants must establish that they are "shingles." Two Hundred Chests of Tea, 9 Wheat. 428 [437]. Or importer might establish that the word "shingles" had a well-known, uniform, and general trade meaning, and that it included the merchandise in question. *Knauth* v. *United States*, 1 Ct. Cust. Appls. 422, T. D. 31499.

This, it is contended by appellee, is a holding that proof of commercial designation must be received and would govern in the construction of the statute now involved. This does not follow. A consideration of the language of the opinion in that case will lead to the conclusion that the language quoted was a statement of the course which might ordinarily be followed by a protestant to establish his case, and was not at all intended to indicate that, in a case where the point was at issue, this court would hold that the word "shingles" was susceptible of proof of commercial designation. Indeed it may fairly be inferred from what we said in the succeeding language of the opinion in that case that the contrary would be the holding. But be that as it may, we have now presented, for the first time, the question of the susceptibility of the word "shingles," as it appears in said paragraph 1660, to proof of commercial designation. On the part of the appellant it is vigorously contended that it is evident, from the history of the legislative provision in question, and from the proceedings in Congress at the time of its adoption as a part of the Tariff Act of 1922, that the word "shingles" was intended

by the Congress to refer only to wooden shingles, and that, therefore, evidence may not be heard to prove commercial designation to the contrary.

In the *Hampton* case, *supra*, in discussing the common meaning of the word "shingles," we said:

It is apparent from an examination of the various provisions of our Tariff Acts that the word "shingles," as used therein, has been used to indicate a manufacture of wood. Shingles were first provided for in the Tariff Act of June 6, 1872, and were carried as a separate item in the dutiable list. In the Act of March 3, 1883, included within "Schedule D: Wood and manufactures of" was the item "shingles, 35 cents per one thousand." The Act of October 1, 1890, included within the same schedule a paragraph as follows: "226. White pine shingles, twenty cents per one thousand; all other thirty cents per one thousand." In the Act of August 27, 1894, in the free list, under the general heading "Wood," appeared the item: "682. Shingles." In the Act of July 24, 1897, under "Schedule D: Wood and manufactures of" appeared the item: "203. Shingles, thirty cents per thousand." In the Act of August 5, 1909, shingles also appeared in said Schedule D, while in the Act of October 3, 1913, in the free list, appeared this item, "647. Wood. * * * Shingles * * *."

Manifestly, during all our tariff history, up until the time of the consideration and passage of the Tariff Act of 1922, shingles were treated and considered by Congress as manufactures of wood. A distinction once made by Congress as to tariff commodities will be presumed to continue, in the absence of anything showing a contrary legislative intention. *United States* v. *Davies & Co.,* 11 Ct. Cust Appls. 392, T. D. 39317.

An inspection of the proceedings of the Sixty-seventh Congress, at the time of the consideration and passage of the Tariff Act of 1922, demonstrates that shingles were there considered as products of wood. The Summary of Tariff Information, 1921, prepared by the United States Tariff Commission for the use of the Committee on Finance of the Senate, page 572, as to the item "shingles," says: "Shingles are among the important wood products and have given rise to considerable tariff controversy." In the hearings before the Ways and Means Committee of the House of Representatives, representatives of American lumber associations appeared, and in extensive hearings requested the imposition of an import duty on shingles to protect American shingle mills from Canadian products. Hearings, H. of R., pp. 1328–1343 and pp. 4138–4141. Thereafter an item was inserted in the bill, under the heading "Schedule 4: Wood and manufactures of," imposing a duty of 50 cents per thousand on shingles. In the report made by the Ways and Means Committee to the House, the following was stated:

Paragraph 408 imposes a duty of 50 cents per thousand on shingles. Shingles are now admitted free of duty, and American shingle mills in the Northwest as a result have been forced to suspend operations. The shingle industry is one of magnitude, and the adverse effect of the existing law is working a hardship on those who depend for their livelihood upon the shingle industry. The rate on shingles recommended by the committee is very moderate, but it is hoped by the committee that it will result in the resumption of operations in domestic shingle mills.

When the bill went to the Senate very extensive hearings were had on this subject. Senate hearings, pt. 6, pp. 4935–5011. Here representations were made by many witnesses that the conservation of American forests required shingles and other wood products to be free listed, and accordingly the Senate so amended the bill as to place shingles as an item in the free list. In these proceedings, and in the debates thereon in both Houses of the Congress, the subject

was universally discussed with the understanding that "shingles" meant a wooden product.

On the other hand in the hearings before the Finance Committee of the Senate (Pt. V, pp. 3983–4009, and Pt. VII, p. 5394), American manufacturers of asbestos appeared, urging protection against importation of foreign products of asbestos, including asbestos shingles, in connection with the consideration of paragraph 1401, hereinbefore quoted. In the Ways and Means Committee of the House (hearings, pp. 3410–3419) a similar showing was made. It is equally manifest that asbestos shingles were being considered by the committees of Congress as manufactures of asbestos, and under which classification all manufactures in chief value of asbestos have been classified since and including the act of October 1, 1890.

In addition to what was said in that case, an inspection of the statute, paragraph 1401, discloses that it was the evident intent of Congress to include therein all manufactures of asbestos. The paragraph does not contain a "not specially provided for" clause, which it would, obviously, have contained if it had been intended that roof covering, made of asbestos, should be elsewhere classified. The Congress plainly had in mind the protection of the American asbestos manufacturing industry, for, by paragraph 1515, unmanufactured and crude asbestos is made free of duty, while, as we have seen, any manufactured product thereof is made dutiable by said paragraph 1401. The paragraphs in question follow:

PAR. 1401. Asbestos, manufactures of: Yarn and woven fabrics composed wholly or in chief value of asbestos, 30 per centum ad valorem; all other manufactures composed wholly or in chief value of asbestos, 25 per centum ad valorem.

PAR. 1515. Asbestos, unmanufactured, asbestos crudes, fibers, stucco, and sand and refuse containing not more than 15 per centum of foreign matter.

Soon after the organization of this court we held, following *Two Hundred Chests of Tea*, 22 U. S. 428, and *Cadwalader* v. *Zeh*, 151 U. S. 176, that where words were used in a Tariff Act to designate particular kinds of goods, having a general, definite, and uniform signification in our trade and commerce, different from their ordinary meaning, the commercial meaning must prevail. *United States* v. *Borgfeldt*, 1 Ct. Cust. Appls. 255, T. D. 31279. And this has remained a well-settled rule of customs law construction. *Lee & Co.* v. *United States*, 15 Ct. Cust. Appls. 202, T. D. 42236.

But this rule has its limitations. If, in the consideration of a statute, it appears, from its language or from its context, from the legislative history of the act, or from other material facts, that it was the intent of the legislative body to restrict the meaning of the words used to their common meaning, then any commercial meaning which the words employed in the act may have must yield to the legislative intent, which is, after all, the major guide to construction.

In *Cadwalader* v. *Zeh, supra,* the court said:

It has long been a settled rule of interpretation of the statutes imposing duties on imports that if words used therein to designate particular kinds or classes of

goods have a well-known signification in our trade and commerce, different from their ordinary meaning among the people, the commercial meaning is to prevail, unless Congress has clearly manifested a contrary intention; * * *.

In *Habicht, Braun & Co.* v. *United States*, 2 Ct. Cust. Appls. 457, T. D. 32206, this court said:

We think the internal evidences of the paragraph itself would have justified the board in excluding all testimony going toward the point of commercial designation upon the ground, as set forth in the case of *Newman* v. *Arthur, supra*, that not only was there lack of intent upon the part of Congress to use the words in a commercial sense, but its adjective character and descriptive force are peculiarly of that quality as to plainly indicate a broad general description upon the part of Congress of all classes of this merchandise whether in the shell or out, regardless of condition.

The Circuit Court of the Southern District of New York, in *Roosevelt* v. *Maxwell*, 20 Fed. Cas. 1155, considered this question, and said:

The commercial understanding of the terms might be adopted, if it did not appear, by the act itself, that a different meaning was intended by the lawmakers. And if it does appear, by the act itself, that a particular meaning was intended by the terms used, then that particular meaning should be adopted, in giving a construction to the act, whatever the commercial meaning of the terms may have been.

The best expression of the Supreme Court on the subject now under discussion is found in *United States* v. *Stone & Downer Co.*, 274 U. S. 225. The court there clearly recognizes the exception to the rule of commercial designation, that where, from the language of the act and the surrounding circumstances, it is plain that the Congress intended the common and not the commercial meaning of the terms employed to prevail, this intent will be carried into effect by the court.

In entire harmony with this view are *Robertson* v. *Salomon*, 130 U. S. 412, *United States* v. *Klumnp*, 169 U. S. 209; *Holy Trinity Church* v. *United States*, 143 U. S. 457.

It is, however, contended by appellee that the intent of Congress must be gathered from the language of the act itself and its context, and that recourse may not be had to the debates, reports, and other proceedings of the Congress in order to ascertain that intent. In support of this position *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290 is relied upon. The case thus cited, in turn, rests largely upon the authority of *Aldridge* v. *Williams*, 3 How. 9 (24), and *United States* v. *Union Pac. R. R. Co.*, 91 U. S. 72. In each of the cases cited advantage was sought to be taken of the views expressed by individual Members of the Congress, in debate. In *Aldridge* v. *Williams, supra*, the law is expressed thus by Mr. Chief Justice Taney:

In expounding this law, the judgment of the court can not, in any degree, be influenced by the construction placed upon it by individual Members of Congress

in the debate which took place on its passage, nor by the motives or reasons assigned by them for supporting or opposing amendments that were offered. The law as it passed is the will of the majority of both Houses, and the only mode in which that will is spoken is in the act itself; and we must gather their intention from the language there used, comparing it, when any ambiguity exists, with the laws upon the same subject, and looking, if necessary, to the public history of the times in which it was passed.

But, while the views of individual Members of the Congress, expressed in debate, have not been treated as competent evidence of any desired construction of a statute, the rule must be considered as modified to the extent that statements made upon the floor, in debate, by the chairman or other member representing the committee having the legislation in charge, are to be considered. We have so held in several instances. *Willenborg & Co.* v. *United States*, 6 Ct. Cust. Appls. 451, T. D. 35985; *Wright & Graham Co.* v. *United States*, 6 Ct. Cust. Appls. 528, T. D. 36147; *Koch & Co.* v. *United States*, 6 Ct. Cust. Appls. 534, T. D. 36148; and such debates have been resorted to as a means of ascertaining the environment at the time of the enactment of a particular law, that is, the history of the period when it was adopted. *Standard Oil Co.* v. *United States*, 221 U. S. 1 (50).

The rule is well settled that reports of congressional committees having the bill in question in charge may be properly considered in interpreting statutes wherein the language is of doubtful meaning. *United States* v. *Sickel*, 6 Ct. Cust. Appls. 146, T. D. 35394; *Arden* v. *United States*, 13 Ct. Cust. Appls. 42, T. D. 40879; *McLean* v. *United States*, 226 U. S. 374 (380); *Lapina* v. *Williams*, 232 U. S. 78 (90); *Carminetti* v. *United States*, 242 U. S. 470 (490); *United States* v. *Stone & Downer, supra.* While the language of the act before us is not of doubtful meaning, it is attempted by appellee to give to it a meaning other than its ordinary one, and, it being uncertain whether the Congress intended other than the common meaning to be attached to it, such reports may properly be considered.

In ascertaining the intent of Congress, the history of the times has always been considered material and relevant. *United States* v. *American Express Co.*, 2 Ct. Cust. Appls. 95, T. D. 31636; *Tilge* v. *United States*, 2 Ct. Cust. Appls, 129, T. D. 31662; *United States* v. *Sheldon & Co.*, 9 Ct. Cust. Appls. 153, T. D. 37994; *Central Com. Co.* v. *United States*, 11 Ct. Cust. Appls. 131, T. D. 38935; *Microutsicos* v. *United States*, 2 Ct. Cust. Appls. 342, T. D. 32078; *American Bead Co.* v. *United States*, 7 Ct. Cust. Appls. 18, T. D. 36259; *United States* v. *Bigelow-Hartford Carpet Co.*, 15 Ct. Cust. Appls. 74, T. D. 42156. This court has, on occasions, in surveying the history of the times, adverted and given note to the hearings before legislative committees, and Notes on Tariff Revision furnished to the committees for their information. *Wright & Graham Co.* v.

*United States,* 5 Ct. Cust. Appls. 453, T. D. 34976; *United States* v. *Beadenkopf Co.,* 8 Ct. Cust. Appls. 283, T. D. 37539; *Sheldon & Co.* v. *United States,* 7 Ct. Cust. Appls. 454, T. D. 37024; *United States* v. *Blumenthal & Co.,* 13 Ct. Cust. Appls. 407, T. D. 41325; *C. & P. Telephone Co.* v. *Manning,* 186 U. S. 238 (245).

It is apparent, therefore, in view of the authorities, that this court may take into consideration the history of the times when the act now before us was enacted, the circumstances surrounding the incorporation of the particular paragraphs in question, and the objects for which such legislation was enacted, so far as they appear to us from the act itself and the facts stated hereinbefore and in *Hampton, jr.,* v. *United States, supra.*

From a consideration of these various elements of proof it appears that the congressional intent was to limit the meaning of the word "shingles," in paragraph 1660, to articles made, in a tariff sense, of wood. Especially must we come to this conclusion, in view of the fact that paragraph 1401 provides for all other manufactures composed wholly or in chief value of asbestos, from which it seems clear that the Congress did not intend that proof of commercial designation should remove from that paragraph shingles composed wholly or in chief value of asbestos.

The judgment of the court below is therefore *reversed.*

Smith, J., concurs on the ground that commercial designation was not established.