UNITED STATES *v.* MARSHALL FIELD & Co. (No. 3305)[1]

United States Court of Customs and Patent Appeals,
November 10, 1930

*Charles D. Lawrence,* Assistant Attorney General (*William H. Futrell,* special attorney, of counsel), for the United States.
*James W. Bevans* for appellee.

---

[1] T. D. 44404.

[Oral argument October 13, 1930, by Mr. Futrell]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

The question involved in this appeal is that of the dutiable classification of an importation of wool-felt rugs, or small-sized carpets, used to cover the floors of what are known as children's play yards, these "yards" being small portable enclosures with wooden floors upon which the articles are spread. Two protests, Nos. 74488 and 74489, are at issue.

The rugs are admitted in the brief of appellee to be "made ornamental and attractive to children by having appliquéd designs forming animals or figures cut from pieces of felt and embroidered."

The merchandise was advisorily returned for duty by the appraiser and assessed by the collector at 75 per centum ad valorem, under paragraph 1430 of the Tariff Act of 1922, as "rugs in chief value of wool, embroidered or appliquéd."

The importer protested this classification, claiming the goods to be dutiable under paragraph 1117 of the act "either directly or by similitude by virtue of paragraph 1460, at the rate of 30 per centum ad valorem as floor coverings in chief value of wool."

The protest was sustained by the Customs Court and the Government appeals.

In its assignment of errors the Government alleges that the court should have overruled the protest and either sustained the collector's classification, or, in the alternative, applied paragraph 1116, assessing the merchandise at 55 per centum ad valorem.

The pertinent portions of the first two paragraphs thus at issue are:

PAR. 1430. * * * articles embroidered * * * appliquéd, * * *; all the foregoing, finished or unfinished, by whatever name known, and to whatever use applied, * * * when composed wholly or in chief value of yarns, * * * 75 per centum ad valorem.

PAR. 1117. * * * All other floor coverings, including mats and druggets, not specially provided for, composed wholly or in chief value of wool, 30 per centum ad valorem.

Paragraph 1116 will be hereafter quoted.

The decision of the Customs Court said in part:

From a careful examination of the record before us, we find that the merchandise in question consists of felt rugs or floor coverings similar to those passed upon by the Court of Customs Appeals in the case of *United States* v. *Borgfeldt & Co.,* 14 Ct. Cust. Appls. 240, T. D. 41873, following which we hold the merchandise in question to be properly dutiable at the rate of 30 per centum ad valorem under paragraph 1117 of the Tariff Act of 1922.

The first contention of the Government is that the case at bar is distinguishable from the *Borgfeldt* case, *supra*, in that the merchandise

there involved was made of "*goat hair,* in chief value of a foundation material of felted goat wool, pounded and pressed together   *   *   *," whereas, in the instant case, "the importer, both in the protests and in the brief filed in the court below, concedes that the merchandise in question is composed wholly or in chief value of wool   *   *   *." (Italics quoted.)

The claim of appellee is that "they are dutiable at thirty per centum as floor coverings in chief value of wool, the theory being that the threads are not 'yarns, threads and filaments,' in the meaning of paragraph 1430."

The Government insists that since the articles are admittedly appliquéd, then if they are composed of "yarns, threads or filaments," paragraph 1430 applies to them; that the burden rests upon the importer to show that they are not so composed; that importer has failed to make the requisite negative proof, and, therefore, the collector's classification must stand under the rule of presumptive correctness.

In the *Borgfeldt & Co.* case, *supra,* upon the authority of which the Customs Court determined the instant controversy, it was found that the rugs were made of felted goat wool. The manufacture does not appear to have been a weaving process, but the goat wool was "pounded and pressed together, without further manufacturing process." The materials were not, therefore, in the form of yarns or threads or filaments capable of being woven. The court, in fact, said that the individual hairs of the felt foundation were of various lengths, "none apparently exceeding four inches" and "incapable, without being united with other material and further processed, of being used in weaving, knitting, sewing, or other similar processes."

This was not a finding or holding that goat wool was incapable of being woven. On the contrary, the implication is clear that, at least, upon being mixed with other material, it can be woven, knitted, etc.

It was rather a finding that the rugs there involved were made of material which, as used, was in a form not then suitable for weaving, etc., and the rugs there involved were not, in fact, woven, but were produced by pounding and pressing the material together. In the *Borgfeldt & Co.* case, *supra, United States v. Veit, Son & Co.,* 8 Ct. Cust. Appls. 290, T. D. 37540; and *Rolland Frères (Inc.) v. United States,* 11 Ct. Cust. Appls. 321, T. D. 39141, are cited as having directly-analogous phases, while *Kayser & Co. v. United States,* 13 Ct. Cust. Appls. 474, T. D. 41367, upon which the Government relied, was discussed and differentiated from the *Borgfeldt* case.

We do not construe paragraph 1430 to mean that the mere fact that an article is composed of materials which are *susceptible of being made into yarns,* threads or filaments, but have not, in fact, been advanced to such a stage when put into the article, renders that article subject

to the paragraph. The article, to come within the paragraph, must, we think, be composed wholly or in chief value of materials which, in the process of its making, were actual yarns, threads or filaments.

When this rule is applied to the instant case, manifestly the question is, In what condition was the material when manufactured into the rugs or mats? Had it been processed into yarns, threads or filaments, or was it in a stage back of that? Obviously if composed of sheep wool the material was *susceptible* of being finally made into yarns; but had it been so treated, or was it in a prior stage?

The record is not as complete on this point as might be wished. The importer called one witness; no testimony was offered by the Government, and objection was made by Government counsel to the incorporation of the appraiser's advisory report to the collector. The judge of the Customs Court before whom the testimony was taken held that the court could not order it in over the Government's objection. No sample of the merchandise was filed. In protest No. 74488 there appears in the appraiser's answer to protest the statement:

The merchandise consists of nursery rugs in chief value of wools appliquéd.

In protest 74489 the statement in the answer is:

The merchandise consists of rugs of felt embroidered or appliquéd.

One invoice accompanying the entry papers shows the goods described as "nursery carpets"; the other as "nursery rugs."

The one witness whose testimony was taken was a lady who was an assistant buyer in the infants' department of the importing company.

After stating that she was familiar with the merchandise and that it was used as coverings for children's play yards, being taped on the wooden floors to render them more comfortable, her testimony was:

Q. Do you know the material of which they are made?—A. Of felt.
Q. Wool felt?—A. Wool felt.

Later on she testified that the appliqué material was the same as that of the rugs upon which it was placed—"felt." Any embroidery, she stated, would have to be of a different material. * * * "you can not use felts."

This constitutes all the evidence in the case relating to the nature or condition of the material of which the bodies of the rugs were made.

It would seem that the importer, having upon it the burden of overcoming the presumption of correctness attaching to the collector's classification, might have gone to the pains of making a more detailed showing. We presume that it supposed the meaning of the word "felt" to be so well known as not to require this, and perhaps it is;

but in dealing with tariff terms, which are frequently highly technical, the courts are appreciative of all the aid which can be given by full, legitimate, but always succinct, evidence.

We have examined the several authorities available to us to ascertain the definitions of the words "felt" and "carpet-felt," and quote such of these as appear to be in any wise pertinent:

Funk & Wagnalls' Standard Dictionary:

Felt, n. 1. Properly, a fabric made by interlocking or compacting wool, fur or hair, or a mixture thereof, by rolling or pressure, without weaving, often with the aid of glue and heat; also a woven fabric whose fibers are matted by shrinking or otherwise.

2. A piece of material so made; also, some article manufactured therefrom, as a hat.

Under the definition of carpet this authority says:

Several varieties of carpet are named from their material; as chenille carpet, felt c., paper c., rag c., etc.

Webster's New International Dictionary gives the following as noun definitions:

Felt, n. 1. A cloth or stuff made of matted fibers of wool, or wool and fur, or hair, pulled or wrought into a compact substance by rolling and pressure, with lees or size, without spinning or weaving.

2. An article, esp. a hat made of felt; rarely a hat made of any other material.
   *     *     *     *     *     *     *

4. A mat or thick mass of hair, roots, or fibrous substance.

Felt carpet this authority defines as:

A carpet made by felting, without weaving.

The Century Dictionary and Cyclopedia defines "felt" as:

1. An unwoven fabric of short hair or wool, or of wool and fur, agglutinated or matted together, with the aid usually of moisture and heat, by rolling, beating, and pressure.

2. A piece of this material; some article of wearing apparel made of it; specifically a hat, made of felted wool.

The same work defines "Felt carpet" as:

A carpet in which the fibers are matted or felted together without spinning or weaving.

The English Dictionary (Oxford) defines "Felt" as:

1. A kind of cloth of stuff made of wool, or of wool and fur, or hair, fulled or wrought into a compact substance by rolling and pressure, with lees or size.

2. A piece of this material, something made of felt.

3. A thickly matted mass of hair or other fibrous sustance; hence, a provincial name for the creeping wheatgrass or conch grass.

It will be observed from the definitions quoted that the Standard Dictionary is the only authority which mentions a woven fabric as being included under felt, and that is one whose fabrics are matted by "shrinking or otherwise."

The Customs Court found as a fact that the merchandise in issue is similar to that passed upon in the *Borgfeldt & Co.* case, *supra*, which means that they found the material of which the articles are composed not to have been yarns, threads, or filaments in the condition in which used in their manufacture.

In the light of the dictionary and scientific definitions which we have above set forth, we think the evidence of the witness that the material is "wool felt," being uncontroverted, sustains this finding of fact, and that the importer, rather unsatisfactorily indeed, but, at least, *prima facie*, met the burden of overcoming the presumptive correctness of the collector's classification.

So far as the issue lies between paragraphs 1430 and 1117, therefore, we find no error in the decision of the Customs Court.

The second insistence of the Government, and the one which really appears to be pressed with most earnestness before us, is that the merchandise, if not falling under paragraph 1430, should be classified under paragraph 1116, as "other carpets and rugs not made on a power-driven loom."

It is established by the testimony that the merchandise "is all handwork." It was not, therefore, made on a power-driven loom. Indeed, if it be felt, as found, it was not made on any kind of loom, or by any process of weaving, but by rolling or pressing, so as to compact it.

It is this latter fact, largely, which leads us to the conclusion that it was not the intention of Congress to include such merchandise as is here involved in the 1116 paragraph.

That paragraph reads in full as follows:

PAR. 1116. Oriental, Axminster, Savonnerie, Aubusson, and other carpets and rugs, not made on a power-driven loom; carpets and rugs of oriental weave or weaves, produced on a power-driven loom; chenille Axminster carpets and rugs, whether woven as separate carpets and rugs or in rolls of any width; all the foregoing, plain or figured, 55 per centum ad valorem.

We are convinced that the reasonable and proper construction of paragraph 1116 is that it was intended to include therein only *woven* carpets and rugs made from or with yarns, threads, and filaments; and that to segregate "other carpets and rugs, not made on a power-driven loom" from the remainder of the types mentioned in the first clause, and treat the former as *not* meaning articles *woven* from yarn, threads and/or filaments, would be erroneous.

When this paragraph is subdivided for the purpose of analysis, it appears that five specific and two general types of carpets and rugs are therein provided for, to wit: (1) Oriental; (2) Axminster; (3) Savonnerie; (4) Aubusson; (5) chenille Axminster, whether woven as separate carpets and rugs or in rolls of any width.

The above five comprise those named specifically. The general classes are: (6) other carpets and rugs, *not* made on a power-driven loom; and (7) carpets and rugs of oriental weave or weaves, which are produced on a power-driven loom.

We think the descriptions of the processes of production of the respective types which appear in the paragraph are clearly explained by the legislative history hereinafter set forth.

That part of the paragraph which names the articles to be included consists of three clauses, separated by semicolons. Classes 1, 2, 3, 4, and 6, of the above subdivisions are in the first clause; class 7 is in the second clause; and class 5 is in the third clause.

There is no question but that each of the types, unless it be the sixth class in our subdivision, is produced by a process of weaving either by hand or on power-driven looms. The inquiry, therefore, arises, Did Congress intend the sixth class, provided for in the first clause of the paragraph, to comprise articles not woven by any method and not made of yarns, threads, or filaments, but of felt?

We can not think so. It seems to us clear that Congress was providing in the paragraph strictly for woven products and that it was the legislative intent that this sixth class should include only those carpets or rugs woven of yarns, threads, or filaments by some process other than on a power-driven loom. The seventh class, oriental weave or weaves on power-driven looms, is cared for in the second clause of the paragraph.

The first four classes and the sixth class are, as heretofore stated, all in a single clause. The individual items are separated by commas and the complete clause is followed by a semicolon. While punctuation is not a controlling element in the interpretation of a statute, *Barrett* v. *Van Pelt*, 268 U. S. 85, nevertheless punctuation marks do have their place in ascertaining the meaning of language and in determining the legislative intent. *Markell* v. *United States*, 16 Ct. Cust. Appls. 518, T. D. 43239.

Had Congress intended that "other carpets and rugs" should constitute a class by themselves without reference to the state of the materials of which composed, provided they were not made on a power-driven loom, it seems to us, the word "and" now appearing after "Aubusson" would have been omitted and a semicolon inserted in its stead, or that some other wording would have been chosen for this, evidently carefully studied, paragraph.

The phrase "not made on a power-driven loom" either relates back to each type of carpet mentioned before it—"Oriental, Axminster, Savonnerie, Aubusson, and other"—or else it was presupposed that the first four types were, in fact, not made on power-driven looms, and, in order to render it certain that all similar types, even though some new name should arise in the trade and be applied,

would be included, the words "other * * * not made," etc., were inserted.

It is not necessary to determine here which alternative is correct, because in either event, we feel sure, from the context, that Congress must have there had in mind other *woven* rugs, not made on a power-driven loom.

It is well known, as will hereinafter more fully appear, that the four types specifically named were (and the most valuable of them are yet) made on hand looms, or by some process of weaving other than power-driven looms. Each of these articles when hand-woven is of the most costly type of carpets and rugs which are imported into this country, and it will be observed that paragraph 1116 provides the highest rate of duty of any of the carpets and rugs provisions—55 per centum ad valorem. The other classes are provided for in paragraph 1117 at 40 per centum and 25 per centum, respectively; and then follows the provision for articles which may not be strictly referred to as either carpets or rugs, but which are more generally known by other names, such as mats or druggets. So as to be sure to cover all such the statute uses the general designation of "floor coverings."

To place these relatively cheap articles, composed of compressed wool, not woven, and intended only for rough usage by playing children in a dutiable class with the most luxurious carpets and rugs would be contrary to the general and well-known congressional policy and practice; and we are unable to agree with the Government's contention that the language of the paragraph may properly be construed to do so.

While we do not regard the paragraph as being particularly ambiguous there is possibly an element of doubt sufficient to justify our looking to its legislative history for aid in its interpretation. This we occasionally do. *United States* v. *Stone & Downer Co. et al.*, 16 Ct. Cust. Appls. 82, T. D. 42732, and cases therein cited.

The Summary of Tariff Information, 1920, was furnished by the Tariff Commission primarily for use of the Committee on Ways and Means of the House of Representatives in preparing what became the Tariff Act of 1922. This summary gave the texts of the tariff laws of 1909 and 1913, respectively, and in addition to giving general information relative to the description and uses of articles, production in the United States, imports and exports, gave also the interpretations as made by the courts, with comments thereon.

This summary, beginning on page 462, discusses the several types of carpets in the order in which they had been provided for in the acts of 1909 and 1913. Aubusson and Savonnerie carpets were therein described as being made on hand looms. Axminster was originally a hand-made carpet, and it is there stated that in Europe "it is still made in this way for the luxury trade," but that the bulk

is now machine made, those so made by machine being "generally *moquette* or royal Axminster and *chenille* or patent Axminsters."

The committee, in preparing the bill, made many changes in structure and phraseology from the texts of the 1909 and 1913 acts, and what is paragraph 1116 of the present law appeared in the committee bill and passed the House (as 1117 of bill) in the exact form which it has in the law, except as to the rate of duty. This was practically true also of that portion of paragraph 1117 (of the law; 1118 of House bill) which provides for floor coverings, etc., under which the Customs Court has held the merchandise of the instant case to be classifiable.

After the bill had passed the House and while it was pending before the Finance Committee of the Senate, the Tariff Commission supplied the Summary of Tariff Information, 1921, for the use of that committee in considering amendments which it might choose to offer to the measure.

Beginning at page 992 of this latter volume, carpets, rugs, etc., are treated. It is stated that "the term 'oriental rug' includes the hand products" of various countries; that these rugs are "usually produced in the home and with primitive appliances"; that "the foundation threads are generally of linen or hemp and these are covered with a pile consisting of tufts of wool knotted to the warp by the weaver's fingers"; that these are fundamentally superior to the machine-made goods; that European hand-tufted rugs of which the "real" Axminster, the Savonnerie and the Aubusson are typical, are "usually produced in workshops having improved appliances and where better materials are used than those employed in the oriental rugs," but "although the two varieties differ in design the details of their manufacture are essentially the same"; that a loom has been invented which produces an article similar to those of oriental weave, although "until recently it was thought impossible to develop a power loom" which would do this; that chenille Axminsters are mainly high-priced articles made on a power loom; and the following is stated relative to the paragraph which, in the renumbering, was changed from 1117 to 1116:

The intent of the paragraph * * * is to include *only such carpets and rugs as are distinctively luxuries*. Falling within this classification are handmade carpets and rugs such as the Oriental, "real" Axminster, Savonnerie, and Aubusson, and also chenille Axminsters which, although made on a power loom, necessitate a large amount of handwork and are costly goods which are in much the same class as handmade goods. There is also included "carpets and rugs of Oriental weave or weaves, produced on a power-driven loom." The term "Oriental weave or weaves" means woven similar to the Oriental; that is, with knotted pile. This provision at present covers the product of only one loom that invented by J. K. Dalkranian, but is inserted because of possible future developments in the production of knotted-pile carpets by machinery. [Italics ours.]

Of the subdivision of paragraph 1117 of the law, being the portion under which appellee claims, the 1921 summary, page 998, says:

All other floor coverings, including mats and druggets, not specially provided for, composed wholly or in chief part of wool  *  *  *  is a basket clause that covers a number of miscellaneous floor coverings.  *.  *  *  *Felt carpets are included in this catchall provision.*  [Italics ours.]

In the light of these statements and interpretations by the Tariff Commission, the statutes in issue were framed and passed, and we are of opinion that all doubt as to the legislative intent which might arise in construing the paragraphs without extrinsic aid, is set at rest by this history.

We hold that paragraph 1116 is not applicable, and the judgment of the Customs Court is *affirmed*.