BRECHT CORP. *v.* UNITED STATES (No. 4039) [1]

United States Court of Customs and Patent Appeals, May 3, 1937

*Pickrell & McDonald* for appellent.

*Joseph R. Jackson*, Assistant Attorney General (*Marcus Higginbotham, Jr.*, special attorney, of counsel), for the United States.

[Oral argument April 8, 1937, by Mr. McDonald and Mr. Jackson]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The Collector of Customs at the port of New York classified certain artificial sausage casings as manufactures of gelatin and assessed the

---

[1] T. D. 48977.

same with duty at 25 per centum ad valorem under paragraph 41, Tariff Act of 1930. The importer protested the said action of the collector and claimed the merchandise to be classifiable free of duty as sausage casings under paragraph 1755 of said act, or alternatively as a nonenumerated manufactured article at 20 per centum ad valorem under paragraph 1558 thereof.

At the trial in the court below it was conceded that the said classification was erroneous and that the merchandise was not gelatin.

The United States Customs Court, First Division, overruled appellant's claim for free entry but sustained its claim under paragraph 1558 as a nonenumerated manufactured article. From the judgment of the trial court importer has here appealed.

The two tariff paragraphs which are here pertinent follow:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 1755. Sausage casings, weasands, intestines, bladders, tendons, and integuments, not specially provided for. [Free.]

The importation was invoiced as sausage casings. The sample of the merchandise introduced at the trial is a strip approximately twenty meters in length and, in the condition imported, is flat and is about three inches in diameter when opened into tubular form. It has the appearance of paper and is semi-transparent. One of appellant's witnesses in the trial below described it in the following terms:

* * * This merchandise is made from what is called a hide split. The hide split is first put into a lime bath, remains in that lime bath for a certain period of time, and is then taken out and washed in cold water. It is then cut into pieces about three inches in diameter and put into a drum. It remains in that drum for a certain period of time, with the drum revolving, and it is again taken out and again washed in cold water. The material is then put into a cutting machine, that cuts it into strips approximately three-quarters of an inch in width. It is then put into another machine, which presses it through a plate in which there are holes about one-quarter inch wide, and this presses it through the plate and reduces it to more or less a plastic mass. It is then put into a kneading machine, which kneads the material until it is of about the consistency of bread dough. From that machine it passes to another machine, which forces it through a sieve under pressure, in order to remove any hard particle that may be left in the material. From that machine it passes to a large cylinder, out of which cylinder it is pressed through a box, and the material that emerges from that box is in tubular form. When it emerges from that box it passes onto a continuous conveyor and travels over that conveyor under heated air for several hundred yards, to dry the material out. As it finishes on the conveyor system it passes through a spray of liquid. After that it is measured on a large wheel into lengths of approximately 20 meters each. It is then placed in troughs in clean water and washed. After the washing it is measured into bundles of 20 meters each, wrapped and finished. Pardon me, after it comes from the bath it is first dried, then measured, then bundled.

Concerning its composition, appellant's witness Harvey A. Seil, a chemist, testified as follows:

* * * I found that exhibit 1 contained 13.6% of moisture, .92% of ash, 15.2% of nitrogen, and the nitrogen calculated to protein, to 95% protein. The saponification number was 155. Volatile acids were present. The sample contained no free formaldehyde, but it contained a trace of combined formaldehyde. The sample itself was insoluble in hot or cold water, also insoluble on boiling in distilled water or dilute ammonia. It was soluble in a 2% boiling caustic soda, and it was hydrolyzed by boiling with dilute acid; and it had a peculiar physical structure, its striations.

Q. Did it have a fibrous structure?—A. Yes, it had a fibrous structure.

There is no dispute between the parties to this suit concerning the correctness of the above-stated facts.

At the trial the importer took the position that the common meaning of the term "sausage casings" as defined by this court was different from its commercial meaning and by thirteen witnesses appellant attempted to establish that the term "sausage casings," at the time of the passage of the Tariff Act of 1930 had a uniform, definite and general commercial meaning different from its common meaning, and that the said commercial meaning included artificial sausage casings such as are here at bar.

Presiding Judge McClelland and Judge Sullivan were the only judges participating in the decision of the case. The former wrote an opinion in which he discussed appellant's commercial evidence and concluded that:

* * * in volume the testimony produced on behalf of the plaintiff established by an undoubted preponderance that in the trade and commerce of the United States buying and selling sausage casings such term had at and prior to the passage of the Tariff Act of 1930 a commercial meaning, different from the common or ordinary meaning of the term, which included the merchandise under consideration, which concededly is artificial sausage casings, but we are of the opinion, notwithstanding the testimony of the witnesses, that it was not the intent of Congress that the term "sausage casings" as used in the free list of the existing or any previous tariff act should include such artificial casings as are here in issue.

Presiding Judge McClelland then stated that notwithstanding the commercial proof, the merchandise could not be classified as sausage casings since a new meaning for the term could not be established in view of the fact that this court in *J. E. Bernard & Co.* v. *United States,* 17 C. C. P. A. (Customs) 398, T. D. 43834, and in *United States* v. *Pacific Butchers Supply Co.,* 22 C. C. P. A. (Customs) 355, T. D. 47377, had definitely established the common meaning of the term. Presiding Judge McClelland then quoted the following from this court's decision in the last-cited case:

The common meaning of a term used in the statute, having been once settled and judicially determined, becomes matter of law and continues until changed language in a subsequent legislative enactment seems to necessitate a change in the common meaning of the term. *United States* v. *Felsenthal & Co.,* 16 Ct.

Cust. Appls. 15, T. D. 42713.   The claim, therefore, under said paragraph 1755, cannot be sustained.

Judge Sullivan wrote a separate concurring opinion in which he concurred in the conclusion of Presiding Judge McClelland which he stated was to the effect that "the merchandise is not susceptible of commercial designation."   Judge Sullivan made no finding concerning the character of commercial proof offered.

We have examined the record with care.   Concerning the character of commercial testimony offered by appellant, we are not prepared to say that the conclusion reached by Presiding Judge McClelland as to what had been proven was erroneous.   We are, however, of the opinion, for reasons presently to be stated, that the strength or weakness of appellant's commercial proof is immaterial.   In this view of the case, it is not necessary for us to set the testimony out or comment on its weight.   Neither do we find it necessary here to pass upon the correctness of the conclusion reached by Presiding Judge McClelland to the effect that where the common meaning of a tariff term has been judicially settled and determined, such meaning becomes a matter of law, and, regardless of proof of commercial meaning of the term, continues until changed by subsequent legislation.   We will say, however, that we find no case which involved commercial proof, as this case does, which affirmatively supports the conclusion reached by Presiding Judge McClelland on this phase of the case.

In many respects the instant case is quite similar to the so-called asbestos shingle case decided by this court in *United States* v. *Stone & Downer Co. et al.*, 16 Ct. Cust. Appls. 82, T. D. 42732.   There, as here, the importer relied upon proof of the commercial meaning of a term.   We held in substance that in view of the legislative history and other extrinsic facts which we had the right to consider, Congress intended to limit the term "shingle" to its common meaning which only included shingles of wood.   After stating the well-known rule as to the effect and force of commercial proof generally applicable in statutory construction, we concluded:

But this rule has its limitations.   If, in the consideration of a statute, it appears, from its language or from its context, from the legislative history of the act, or from other material facts, that it was the intent of the legislative body to restrict the meaning of the words used to their common meaning, then any commercial meaning which the words employed in the act may have must yield to the legislative intent, which is, after all, the major guide to construction.

In *United States* v. *Clay Adams Co., Inc.*, 20 C. C. P. A. (Customs) 285, T. D. 46078, we had under consideration the force and effect of the rule of relative specificity.   We there said:

The rule of relative specificity is a rule of construction employed by the courts in trying to arrive at legislative intent.   Like most rules of construction it is frequently found in conflict with other rules of construction and at times must yield

in controlling influence. *Downing & Co.* v. *United States*, 6 Ct. Cust. Appls. 447, T. D. 35984. All rules of construction must yield if the legislative intent is shown to be counter to the apparent intent indicated by such rule. The master rule in the construction of statutes is to so interpret them as to carry out the legislative intent. *L. R. Markell et al.* v. *United States*, 16 Ct. Cust. Appls. 518, T. D. 43239; *United States* v. *Stone & Downer Co. et al.*, 16 Ct. Cust. Appls. 82, T. D. 42732; *Cassard Romano Co., David A. Haagens* v. *United States*, 19 C. C. P. A. (Customs) 191, T. D. 45294; *Procter & Gamble Mfg. Co.* v. *United States*, 19 C. C. P. A. (Customs) 415, T. D. 45578

It is our duty here to apply the master rule and so to interpret the language in controversy as to carry out the legislative intent. As was true in the asbestos shingle case, while the language of the act before us is not of doubtful meaning when the common meaning is considered, appellant seeks to give it a meaning other than its common, ordinary one. There being uncertainty as to whether the Congress intended that the term should be given its common, ordinary meaning, we may here, as we did in the asbestos shingle case, properly consult legislative history and dependable extrinsic facts in order that the true legislative intent may be arrived at. In the asbestos shingle case, after discussing the character of extrinsic facts which may be considered under such circumstances, this court proceeded to consider the legislative history, history of the times, and other pertinent matter and arrived at the conclusion that when Congress used the term "shingles" it used it in its common, ordinary sense.

The same reasons that prompted us there require that we here give consideration to certain facts and circumstances, which, we think, when considered as a whole, suggest the sense in which Congress used the term "sausage casings."

For approximately half a century prior to the passage of the Tariff Act of 1922, animal intestine sausage casings were admitted free of duty under provisions which were, without material change, repeated in the various tariff acts and covered bladders, integuments, intestines of animals, etc. (sausage casings were not named). In the Tariff Act of 1922 we find for the first time that provision was made in paragraph 1655 (free list) for "sausage casings." The paragraph was identical with paragraph 1755 now under consideration and read:

PAR. 1655. Sausage casings, weasands, intestines, bladders, tendons, and integuments, not specially provided for.

The legislative history concerning this particular paragraph is of special importance here. In the Summary of Tariff Information, 1921, at page 646, which was before Congress when the Tariff Act of 1922 was being prepared, attention was called to the fact that "Sausage casings come within paragraph 419 above [tariff act of 1913]." Paragraph 419 was the provision for "bladders, and all integuments, tendons and intestines of animals [etc.]." After the bill was prepared

and passed the House of Representatives, the provision for "Sausage casings, weasands, intestines, bladders, tendons and integuments, not specially provided for" was inserted into paragraph 706 along with "meats, fresh, prepared, or preserved, not specially provided for" and all made dutiable at 15 per centum ad valorem. After setting this paragraph out and comparing it with certain provisions in former acts, the following statement was made by the Tariff Commission:

SAUSAGE CASINGS, ETC., AND MEATS PREPARED OR PRESERVED N. S. P. F.

*Description and use.*—Under this head fall pickled and cured beef, pickled pork, canned meats, sausage, sausage casings, scrapple, head cheese, livers, sweetbreads, etc. Beef that is dried, salted, or pickled has lost its former prominent position in trade in favor of chilled and frozen beef; pork is, however, most in demand when it is salted, pickled, cured, or otherwise preserved. Canned meats, of which there are many varieties, are increasing in commercial importance.

Statistics concerning the quantity and value of "Sausage casings—intestines, etc." were then given and under *"Suggested changes"* the following appears:

*Suggested changes.*—To maintain the general plan of the rearrangement of the Agricultural Schedule, sausage casings, weasands, intestines, etc., might be provided for in a paragraph separate from meats n. s. p. f.

When the bill got to the Senate Committee on Finance, certain interested parties appeared and there protested against the removal of animal sausage casings from the free list. (See *American Net & Twine Co.* v. *Worthington,* 141 U. S. 468; *United States* v. *Stone & Downer Co. et al.,* 274 U. S. 225.) By amendment proposed in the Committee on Finance of the Senate, the first part of paragraph 706 as it appeared in the House bill relating to "Sausage casings, weasands, intestines, [etc.]" was taken out of the paragraph and was placed in the free list as a separate paragraph. The following appears in Volume 62, pt. 9, p. 9568 of the Congressional Record:

Mr. McCUMBER. Mr. President, I will merely say that the "sausage casings. weasands, intestines, bladders, tendons and integuments, not specially provided for," and here proposed to be stricken out by the committee amendment, have been transferred to paragraph 1644a on the free list. [Which became paragraph 1655.]

The Congressional Record shows no further discussion of the subject matter in either branch of Congress, and the reports of the committees having the bill in charge contain nothing of importance here.

The settled policy of Congress to free list sausage casings made from animal intestines and to make no free provision for artificial sausage casings must have been well understood by Congress at the time the Tariff Act of 1930 was being prepared. This court prior to the passage of the Tariff Act of 1930 had held that artificial sausage casings were dutiable. Before Congress at the time of preparing the 1930 act was the Summary of Tariff Information, 1929. At page 2543, the

Tariff Commission set out paragraph 1655 (which became paragraph 1755) and the following was said concerning it:

### SAUSAGE CASINGS AND TENDONS

*Description and uses.*—Small and large intestines, weasands (trachea or windpipe), bladders, and bungs, are used chiefly for sausage casings, and in the making of "catgut." Inferior and broken gut are used in tallow production, tankage, and fertilizer. There is some use of tendons as glue stock.

*Production.* The production of sausage casings, etc., is not reported separately.

*Imports.* Imports come mostly from China, Argentina, Australia, and Canada; but small casings, *usually dried*, are received from various sources. * * *. [Italics ours.]

Following these data, statistics concerning imported sausage casings such as "sheep, lamb, and goat casings," are given.

In the Dictionary of Tariff Information, prepared by the United States Tariff Commission and published in 1924, appears the following:

SAUSAGE CASINGS, ETC., AND MEATS PREPARED OR PRESERVED N. S. P. F., include pickled and cured beef, pickled pork, canned meats, sausage, sausage casings, scrapple, head cheese, livers, sweetbreads, etc. * * *

* * * In 1921 * * * 102,281,000 pounds of sausage casings were produced in packing houses.

Nowhere in any of the reports of the committees or in any other matter relating to the legislative history of the provisions is there any suggestion that the term "Sausage casings" was meant to cover artificial sausage casings.

From the foregoing facts, it seems reasonable to conclude that when Congress took the provision for sausage casings out of the dutiable meat provision and placed it in the free list with a separate provision for other animal parts, it had in mind only such sausage casings as that term in its common meaning embraced. Since the identical provision was reenacted in the Tariff Act of 1930, unquestionably the term in that act was used in the same sense in which it was used in the Tariff Act of 1922. If Congress had intended in the Tariff Act of 1922 or in the Tariff Act of 1930 to include in the controverted free list paragraph artificial sausage casings, it seems to us that it would have used appropriate language to have accomplished its purpose.

Moreover, we think the rule of *noscitur a sociis* applies here. Like other rules of construction, it too has its limitations. It has often been applied with controlling effect and in some instances this court has, notwithstanding the applicability of the rule, refused to give it controlling effect in arriving at congressional intent. See *United States* v. *R. F. Downing & Co.*, 17 C. C. P. A. (Customs) 194, T. D. 43645. A consideration of the context of paragraph 1755 suggests the propriety of making application of the rule here. Moreover, the effect of the application of the rule harmonizes with our view of the intent suggested by the legislative history and the extrinsic facts to which we have hereinbefore made reference. In the paragraph along

16

with sausage casings are weasands, intestines, bladders, tendons, and integuments, all old tariff terms relating to certain well-known animal organs or parts. It is well understood that artificial sausage casings may be made by a number of different processes from several kinds of raw materials. In view of all the above-stated considerations, it seems to us that we would not be warranted in holding that when Congress used the term "Sausage casings" in paragraph 1755, it meant to include artificial casings.

After careful consideration, we are of the opinion that the United States Customs Court arrived at the right conclusion in holding the merchandise dutiable as a nonenumerated manufactured article and overruling appellant's claim that the importation was free of duty under paragraph 1755, and its judgment is *affirmed.*