(C. D. 1943)

FLORAL ARTS STUDIO ET AL. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 11, 1957)

*Lawrence & Tuttle* (*George R. Tuttle* and *Dan Erik Hedin* of counsel) for the plaintiffs.

*George Cochran Doub*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., not participating

RAO, Judge: Certain imported merchandise, invoiced as rice paper, was classified by the collector of customs at the port of entry as paper, not specially provided for, and, accordingly, was assessed with duty at the rate of 30 per centum ad valorem, by virtue of the provisions of paragraph 1409 of the Tariff Act of 1930.

Basically, it is the position of plaintiffs herein that rice paper is not paper and, therefore, that the collector erroneously invoked the provisions of said paragraph 1409 in classifying the merchandise at bar. In the 15 consolidated protests which comprise the instant suit, or in amendments thereto, the following claims are, in substance, alleged:

1. That rice paper is properly dutiable at the rate of 10 per centum ad valorem, as articles manufactured, in whole or in part, not specially provided for, within the provisions of paragraph 1558 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739.

2. That the subject merchandise falls within the provisions of said paragraph 1558, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, for all raw or unmanufactured articles, not enumerated or provided for, and, hence, is dutiable at the rate of 5 per centum ad valorem.

3. That the provision in paragraph 405 of said act, as modified by said General Agreement on Tariffs and Trade, for wood, unmanufactured, not specially provided for, is applicable and, pursuant thereto, the instant merchandise should have been assessed with duty at the rate of 10 per centum ad valorem.

4. That rice paper is a manufacture of wood, not especially provided for, which is dutiable at the rate of 16⅔ per centum ad valorem, as provided in paragraph 412 of said act, as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T. D. 52373.

5. Finally, and most persistently, it is alleged that rice paper is entitled to free entry as falling within the provisions of paragraph 1722 of said tariff act, for vegetable substances, crude, or unmanufactured, not specially provided for.

During the course of the trial, it was developed through the testimony of plaintiffs' witness Henry Hellmers, a wood technologist and plant physiologist, expert in wood identification, that the material from which rice paper is derived is pith, and not wood. Having

tested a sample of the source material, he found it to be pure cellulose, not containing any lignins or fibrous matter.

Although plaintiffs have not abandoned their claims for classification of the merchandise at bar within the cited provisions of the wood schedule, *supra*, it is apparent from the evidence adduced by them that said provisions are not applicable, and we hold said claims to be without merit.

Further testimony at the trial establishes that rice paper is derived from the pith of a plant known as *Aralia papyrifera* which grows on the island of Formosa. When the stalks are 4 to 6 feet in length, they are cut, and, by means of a bamboo stick, the core or pith of the stalks is pushed out of the hard shell which surrounds it. This pith is then placed on racks for drying. Thereafter, it is transported to the factories, where it is cut into short lengths and placed on a stone block which is banded with brass, with a shim underneath to determine the thickness. There, the material is sliced into thin sheets from 2½ to 4 feet in length, by natives, who roll back the cylinder of pith while peeling it off with the use of a sharp knife, thus forming the sheets. A pile of sheets, 6 to 8 inches high, is cut into squares of 3¼ inches or 3¾ inches. They are packed in bundles three-fourths of an inch or 1 inch in thickness, the standard being the former, averaging 60 sheets to the bundle. The bundles are then wrapped in rice reed and are in that condition when imported.

After importation, the sheets are dyed by oils and colors, and die-cut into various patterns for the making of artificial flowers. So far as the instant record shows, the predominant, if not the only, use in the United States of this material is in the production of artificial flowers.

Samples of the pith; of the sheets in their condition as imported, as they appear after being colored, and, after being die-cut, are part of the record in this case. Some of the instruments used in Formosa, as well as several photographs depicting the process to which the material is subjected, are also in evidence.

As imported, the sheets are white, of a velvety texture, and somewhat brittle.

Plaintiffs' witness, Arvid L. Veidmark, a former Army chaplain, missionary, and businessman, spent 5 weeks in Formosa, during the months of June and July 1953, making a "survey of the wood fiber industry to try to locate its source, manufacturing means, and brokers' supply." It is through his testimony, based upon personal observation, that the method of production of the merchandise at bar was established. He further stated that the Chinese use rice paper for embalming, for painting, and for cutting into the figures of bridges, rickshaws, coolies, and the like.

Raymond E. Raymont, the sole owner of plaintiff Floral Arts Studio, was the witness who gave evidence of the manufacture and use of rice paper in the United States. He stated that he has been in the business of importing and processing rice paper since 1931 and has conducted schools in the United States and Canada where the art of making artificial flowers from this material is taught. To his knowledge, this is the only purpose for which this so-called rice paper has been used during this period of time in this country. Competitors in the artificial flower field, who are located only in Chicago, New York, Seattle, and Los Angeles, generally refer to so-called rice paper as "wood fiber," but when the raw product is purchased, whether abroad or in this country from brokers, it is called, rice paper.

On cross-examination, Raymont was asked whether he agreed with the following definitions of rice paper:

From Webster's New Collegiate Dictionary, published in 1951:

A thin paper made from rice straw. By confusion, a kind of thin, delicate paper, brought from China,—used esp. for painting upon. It is made by cutting the pith of the rice-paper tree (*Tetrapanax papyriferum*) into one sheet, which is pressed flat.

From the Encyclopaedia Britannica, 14th edition, volume 19:

The substance which has received this name in Europe, through the mistaken notion that it is made from rice, consists of the pith of a small tree, *Aralia papyrifera*, which grows in the swampy forests of Formosa. The cylindrical core of pith is rolled on a hard flat surface against a knife, by which it is cut into thin sheets of a fine ivory-like texture. Dyed in various colors, rice paper is extensively used for the preparation of artificial flowers, while the white sheets are employed by native artists for water-colour drawings.

From the Dictionary of Paper, published under the Auspices and Direction of the American Paper and Pulp Association, New York, 1940:

A paper made from the pith of a small tree (*Aralia papyrifera*) which grows in the swampy forests of Formosa. The cylindrical case of pith is rolled on a hard flat surface against a knife, by which it is cut into thin sheets of a fine ivory-like texture. Dyed in various colors, rice paper is extensively used for the preparation of artificial flowers; the white sheets are employed by native artists for water-color drawings.

The witness expressed disagreement with the definition of rice paper given in Webster's Dictionary, but found the others acceptable. As to the latter, he subsequently modified his reply to the extent that he agreed with the source of the product and method of treatment, but not the conclusion that it is paper.

So far as Raymont's knowledge and information were concerned, for the entire period he has been importing rice paper, through various ports in the United States, its classification has been as in the instant case.

The only witness for the defendant was Hollis J. Reed, customs appraiser at the port of Los Angeles. He testified that, in his 25 years of experience as customs appraiser and examiner, rice paper, imported at the port of Los Angeles, has always been classified in paragraph 1409, as paper, not specially provided for.

It needs no elaborate discussion to arrive at the conclusion that the provision for paper, not specially provided for, is more specific than any of the paragraphs cited by plaintiffs as covering the merchandise at bar. By explicit language, paragraph 1558, *supra*, is limited to articles not elsewhere enumerated in the tariff act. It must, therefore, be subordinated to any other provision of the act whose *eo nomine* or descriptive terminology encompasses merchandise in dispute. As for the free-list provision for vegetable substances, crude or unmanufactured, its character as a generic classification is plainly evident. It refers to a vastly greater variety of articles than could possibly fall within the scope of the term "paper," and, in the event that the merchandise at bar might be said to respond to the call of both paragraphs, clearly the provisions of paragraph 1409 must be preferred. If, then, rice paper is, in fact, paper, the propriety of the collector's action in this case is established.

Counsel for plaintiffs urges, in effect, that it is beside the point to consider any definition of the term "rice paper" as there is no provision in the tariff act for "rice paper" *per se*. The term which the collector has applied, and which, therefore, requires construction here, is, it is argued, "paper." The following definitions of "paper" are called to our attention:

Funk & Wagnalls Standard Dictionary, 1952 edition:

A substance consisting essentially of cellulose fibers interwoven into a compact web, made by chemical and mechanical processes from rags, straw, wood, bark, and other fibrous material, into thin sheets or strips. * * *

In the course of manufacture, the raw material, whether intended for hand- or machine-made paper, is subjected to five processes: (1) cleansing, (2) boiling, (3) washing, (4) bleaching, and (5) beating or reducing to a pulp, in which state it is pumped to the paper-making machine.

Webster's New International Dictionary, 2d edition:

A substance made in the form of thin sheets or leaves from rags, straw, bark, wood, or other fibrous material, for various uses. The essential processes in the manufacture of paper are: the reduction of the raw material to a thin pulp.

The Dictionary of Paper, 1951 edition:

The name for all kinds of matted or felted sheets of fiber (usually vegetable, but sometimes mineral, animal or synthetic); formed on a fine wire screen from a water suspension. * * *

Counsel for plaintiffs contends, under the authority of *United States* v. *Tropical Craft*, 42 C. C. P. A. (Customs) 223, C. A. D. 598,

that, to fall within the common meaning of a statutory term, merchandise must conform in all respects to the accepted definition of such term. It is argued that—

The above authorities are unanimous in their defining of paper as regards two crucial points: (1) The material from which paper is made must be one containing fibers in one form or another, and (2) that material is reduced or broken down and suspended in water and chemicals, so that the component fibers may be manipulated to form the desired type of paper.

These definitions are therefore diametrically opposed on both points to relevant testimony concerning the substance in question. The instant material does not contain any fibers or fibrous matter as testified to on cross-examination by Henry Hellmers, a plant physiologist (R. 47). As to the manufacturing process, the uncontroverted evidence contained in the record (R. 10–15), as well as the definitions concerning manufacture of so-called "rice paper" (R. 29–32), shows that the instant merchandise is thin slices of the pith of a plant which has been dried. This does not remotely resemble any element of the process of making "paper" as the authorities define it.

Counsel's argument has its convincing aspects, which, in the absence of more compelling considerations, might be deemed totally persuasive We are constrained to the view, however, that other factors do require a contrary conclusion.

Notwithstanding the language of the definitions quoted, and the apparent restriction thereof to substances produced from fibrous material reduced to a pulp, we regard it as extremely significant that the same authorities, in describing "rice paper," refer to it as "paper." Funk & Wagnalls New Standard Dictionary speaks of rice paper as "A delicate vegetable *paper*." In Webster's New International Dictionary, the expression is "a kind of thin, delicate, *paper*." The Dictionary of Paper refers to rice paper as "A *paper* made from the pith of a small tree." [Italics in the foregoing supplied.]

Thus, by necessary inference, the meaning of the word "paper" is extended beyond the limitations of specific component materials and processes expressed under the definitions of paper.

In the case of *A. L. Tuska* v. *United States*, T. D. 11859, G. A. 850, the merchandise in issue was described as "rice paper." It was classified within the provisions of paragraph 419 of the Tariff Act of 1890, as tissue paper, and was claimed to be dutiable in paragraph 425 of said act as manufactures of paper. Relying upon Webster's definition of rice paper as "a kind of delicate paper brought from China and used for painting upon and for the manufacture of fancy articles. It is said to be made from the pith of a plant, the *Aralia papyrifera*," the board of general appraisers (now the United States Customs Court) found the merchandise before it to be provided for in paragraph 422 of the Act of 1890, as paper, not specially provided for.

That claim not having been advanced by the protestant, the action of the collector was permitted to stand.

While it is true that the issue of whether or not rice paper was a substance other than paper was not raised in the case, nevertheless, the court was of opinion that the tariff provision for paper, not specially provided for, included rice paper. This was, in effect, a judicial finding of the common meaning of paper in respect of its application to rice paper.

Although the testimony in the *Tuska* case, *supra*, insofar as it related to the name—rice paper—by which the involved merchandise was known to the trade may be characterized as tending to establish a commercial designation of that name, the court's conclusion in the case was not predicated upon the commercial meaning of any tariff term. A substance known commercially as rice paper was held to fall within the common meaning of the term "paper." Commercial designation, as a rule for the construction of tariff terms, did not figure in the ultimate conclusion reached.

Common meaning once declared persists until the language construed is changed, or the intention of the lawmakers that a different meaning shall apply is made manifest. *United States* v. *Ben Felsenthal & Co. et al.,* 16 Ct. Cust. Appls. 15, T. D. 42713; *United States* v. *North American Mercantile Co.,* 17 C. C. P. A. (Customs) 378, T. D. 43820; *United States* v. *Pacific Butchers Supply Co.,* 22 C. C. P. A. (Customs) 355, T. D. 47377; *United States* v. *Sheep Shearers Mdse. & Comm. Co.,* 23 C. C. P. A. (Customs) 146, T. D. 48009.

Six successive tariff acts have been enacted since the decision in the *Tuska* case, *supra*, with no substantial change in the catchall provision for paper, not specially provided for, and no other indication that Congress intended to remove rice paper from the category of paper.[1]

It must be presumed that Congress has acted in the light of the judicial interpretation of the provision in question, and, by not effecting a material change in language, has adopted and ratified the court's construction. As stated in the case of *August Bentkamp* v. *United States,* 40 C. C. P. A. (Customs) 70, C. A. D. 500:

* * * There is a presumption of legislative ratification of judicial construction by a single legislative reenactment of an act in the same language after an unappealed decision of the Customs Court, or its predecessor the board. *United States* v. *Illfelder & Co.,* 9 Ct. Cust. Appls. 40, T. D. 37901. But, although highly persuasive, such presumption is not necessarily a strong one in the absence of evidence showing actual notice by Congress, since that tribunal is not the court

---

[1] Act of 1894, paragraph 310—"all other paper not specially provided for in this Act."
Act of 1897, paragraph 402—"all other paper not specially provided for in this Act,"
Act of 1909, paragraph 415—"paper not specially provided for in this section,"
Act of 1913, paragraph 332—"all papers * * * not specially provided for in this section,"
Act of 1922, paragraph 1309—"paper not specially provided for,"

of last resort. See 59 C. J. 1061, 1064 [§ 625 (b)]. However, where subsequent to such a decision Congress has reenacted the construed provision in four successive acts using the same language, as is the case here, the doctrine of legislative ratification of judicial construction is controlling in the absence of very compelling reasons to the contrary (of which we find none in this case). The reason for this is that Congress is presumably cognizant of such judicial interpretation and its consequences, and to hold otherwise in the face of such a series of reenactments would be attributing to that body an unusual indifference or lack of knowledge. That is an attitude to be avoided. *United States* v. *Bassichis Co., et al.*, 16 Ct. Cust. Appls. 410, T. D. 43133, and numerous cases cited therein, *Kelly* case, *supra.*

Accordingly, it is our view that rice paper is paper and that it was properly classified by the collector within the provisions of paragraph 1409 of the Tariff Act of 1930. All claims in the protests are, therefore, overruled.

Judgment will be entered accordingly.