(C.D. 2359)

FLORAL ARTS STUDIOS
FRANK P. DOW CO., INC., ET AL. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided September 19, 1962)

*Lawrence & Tuttle* (*Barnes, Richardson & Colburn* by *Edward N. Glad, Paul J. Gavin, Joseph Schwartz,* and *E. Thomas Honey* of counsel) for the plaintiffs.

*Joseph D. Guilfoyle,* Acting Assistant Attorney General (*Richard E. Fitz-Gibbon, Sheila N. Ziff,* and *Alfred A. Taylor, Jr.,* trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., not participating

RAO, Judge: The 27 protests here involved, which have been consolidated for purposes of trial, contest the collector's classification of certain imported merchandise as paper, not specially provided for, within the purview of paragraph 1409 of the Tariff Act of 1930, or as modified by the Japanese Protocol to the General Agreement on Tariffs and Trade, 90 Treas. Dec. 234, T.D. 53865, supplemented by Presidential notification, 90 Treas. Dec. 280, T.D. 53877, and his assessment of duty thereon at the rate, respectively, of 30 per centum ad valorem or 20 per centum ad valorem.

It is the contention of plaintiffs that said merchandise is properly dutiable at the rate of 10 per centum ad valorem, pursuant to the provisions of paragraph 1558 of said act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, supplemented by Presidential notification, 86 Treas. Dec. 347, T.D. 52827, for articles, not specially provided for, wholly or partly manufactured.

The merchandise in issue was invoiced as rice paper. It is conceded to be identical in character with the rice paper which was the subject of decision in the case of *Floral Arts Studio, et al.* v. *United States,* 46 C.C.P.A. (Customs) 21, C.A.D. 690, and therein held to be paper, not specially provided for, within said paragraph 1409. By agreement of the parties, the record in the cited case was made part of the instant record.

It was also stipulated that identical merchandise was involved in the case of *W. J. Byrnes & Co.* v. *United States*, protest 312698–K, which protest had been dismissed for having been filed prematurely. However, the record in the case, consisting of the testimony of four witnesses, has, by consent of the parties, been herein incorporated.

In *Floral Arts Studio, et al.* v. *United States, supra,* the source and method of production of the rice paper at bar were described as follows:

During the course of the trial below, evidence was adduced to the effect that the imported rice paper was derived from the pith of a plant, the *Aralia papyrifera,* which plant is unrelated to the rice plant, and which pith was found to contain pure cellulose free of lignin and fibrous matter. Testimony was introduced to show that 4 to 6 foot lengths of the *Aralia papyrifera*[2] stalks are cut and the pith or core is separated from the hard surrounding outer shell by being pushed out therefrom. Thereafter, the pith is dried and cut into small cylindrical sections, approximately 1 inch in diameter and $3\frac{1}{4}$ inches in length from which material the imported merchandise is made. The cylindrical sections are sliced into thin sheets some $2\frac{1}{2}$ to 4 feet long by physically peeling off the skin, as it were, with a sharp knife pressed against the cylindrical surface; thereafter the said sheets are cut into rectangles of $3\frac{1}{4}$ by $3\frac{3}{4}$ inch dimensions and piled in bundles for importation. It was further shown below that the imported merchandise is always purchased as "rice paper" and, subsequent to importation, is dyed and cut into various patterns for use in artificial flowers. From the record, this would appear to be the predominant, if not the only, use in the United States of the material in question, although in the Orient it is used as a surface upon which to draw and paint various objects and scenes.

Upon consideration of various definitions of rice paper in standard lexicons and other authoritative texts, including the Dictionary of Paper published under the auspices and direction of the American Paper and Pulp Association, New York, 1951, and in view of the fact that long before paper was first provided for in a tariff statute, "pith material used for analogous purposes to that herein employed was known as paper," the court held that rice paper of the kind there involved fell within the common meaning of the catchall provision for paper in paragraph 1409 *supra,* stating—

According to definitions in dictionaries, common usage and in commercial circles, the merchandise involved with one cited exception has been known for generations and even centuries as paper of some description; and it is therefore our opinion that it comes within the purview of paragraph 1409, of the Tariff Act of 1930.

The cases of *In re Tuska,* T.D. 11859 (G.A. 850), and *In re Lawrence Stationery Co. et al.,* T.D. 12834 (G.A. 1430), wherein rice paper described as a kind of delicate paper made from the pith of the *Aralia papyrifera* plant was held to be paper, were deemed of some significance in supporting the conclusion reached by our appellate court.

---

[2] This plant is also known as Fatsia Japonica and is native to the island of Formosa.

It seems clear from the general tenor of the decision in *Floral Arts Studio, et al.* v. *United States, supra,* that the court entertained very little doubt as to the "paper" character of this material. However, since the substance is not derived from a rice plant, the court acknowledged that the use of the word "rice" in connection with it could be considered misnominal.

For the purposes of the present case, plaintiffs herein accept without question our appellate court's finding that rice paper falls within the common meaning of the word "paper." Their goal here, however, is to show that the term "paper" possessed a special meaning in the trade and commerce of the United States, different from its common meaning, which commercial meaning does not embrace rice paper produced as hereinabove described.

The law is well settled that tariff acts are written in the language of commerce which is presumptively the same as that of common expression. *Swan* v. *Arthur,* 103 U.S. 597; *Meyer & Lange et al.* v. *United States,* 6 Ct. Cust. Appls. 181, T.D. 35436; *C. J. Tower & Sons* v. *United States,* 41 C.C.P.A. (Customs) 195, C.A.D. 550; *United States* v. *M. & D. Miller, Inc.,* 41 C.C.P.A. (Customs) 226, C.A.D. 556. Where, however, it is shown that a given tariff term possessed at the time it was written into the law a meaning for the trade and commerce of the United States which differed from the common understanding, and which was uniform, definite, and general throughout the United States, such meaning will be adopted, unless a contrary intention on the part of Congress is clearly manifested. *Cadwalader* v. *Zeh,* 151 U.S. 171; *United States* v. *Stone & Downer Co. et al.,* 16 Ct. Cust. Appls. 82, T.D. 42732; *Nylos Trading Company* v. *United States,* 37 C.C.P.A. (Customs) 71, C.A.D. 422. The rule of commercial designation "is the first and most important designation to be ascertained in settling the meaning and application of the tariff laws." *Robertson* v. *Salomon,* 130 U.S. 412; *Chew Hing Lung & Company* v. *Wise,* 176 U.S. 156. Nevertheless, it remains but one of many rules devised to assist in the construction of statutory language, which must yield if clear evidence of a contrary intention on the part of Congress exists. *United States* v. *Allen Forwarding Co.,* 42 C.C.P.A. (Customs) 33, C.A.D. 566; *C. J. Tower & Sons* v. *United States,* 46 C.C.P.A. (Customs) 36, C.A.D. 692. In the last analysis, the master rule of statutory interpretation is the ascertainment of legislative intent. *United States* v. *Damrak Trading Co., Inc.,* 43 C.C.P.A. (Customs) 77, C.A.D. 611.

Before considering whether the proof in the instant case suffices to establish a commercial meaning for the tariff term "paper," which would operate to exclude the merchandise at bar, it is first essential to determine whether that term is susceptible of such proof. Counsel for the defendant strongly urges that it is not, contending that the

legislative and judicial history of the provision, especially as it relates to paper made from the pith of the *Aralia papyrifera* plant, clearly demonstrates a congressional desire for the construction of the provision in accordance with its common meaning. It is argued that since 1891 and 1892, when a substance of this character was first judicially held to be paper, in the *Tuska* and *Lawrence* cases, *supra*, five successive tariff acts have been passed without significant change in the basket provision for paper. This, it is stated, constitutes legislative ratification of judicial interpretation so strong as to indicate "overwhelming" approval of the meaning found, and as to plainly show that Congress intended that meaning, alone, to prevail. Counsel further contends that "rice paper" has so long been known as paper that Congress could not have meant to exclude it from the category of "paper, not specially provided for."

A similar thesis with respect to the tariff provision for Rockingham earthenware met with the following observations in the case of *United States* v. *M. & D. Miller, Inc.*, *supra:*

It is thus readily apparent from the foregoing that the term "Rockingham earthenware" has a well established, well defined meaning which has been consistently applied over a long period of years. * * *

Congress in enacting and re-enacting the Rockingham earthenware provision of the various tariff acts, including the Tariff Act of 1930 with its subsequent modifications, did so at a time when the term in question had previously been interpreted by the courts and further defined by the United States Tariff Commission in its reports to Congress and the President. However salient such a fact may seemingly be, it does not, in itself, present sufficient justification upon which to conclusively presume that Congress intended to restrict the classification of Rockingham earthenware to its common (and presumptively commercial) meaning. Despite the knowledge it possessed at the time of enacting the Act of 1930, Congress provided without qualification for Rockingham earthenware, and there is no clear manifestation of an intention to adopt the established common meaning to the exclusion of proof indicative of a true commercial designation differing therefrom. * * *

Accordingly, the fact that "rice paper" has long been embraced within the common meaning of the term "paper," within the understanding and knowledge of Congress, does not alone suffice to establish a legislative intent that the term "paper" be construed solely in accordance with such common meaning.

No other considerations demonstrative of a legislative intent opposed to the principle of commercial designation have been advanced or suggest themselves. It is our interpretation that when our appellate court held "rice paper" to be paper, it proceeded on the presumption that commercial meaning was the same as common meaning and did not intend to rule out commercial designation. The opinion plainly states that common meaning was its objective, and it does not advert to any special circumstances indicative of a congressional intent to

exclude proof of commercial meaning. Consequently, we are of opinion that the provision for "paper, not specially provided for," is susceptible of proof of commercial designation.

If there has been established in the case at bar that, at or about the time of the enactment of the Tariff Act of 1930, to wit, June 17, 1930, there existed in the trade and commerce of the United States a meaning for the term "paper," which was uniform, general, and definite and which, by excluding the instant merchandise, to that extent, differed from its common meaning, plaintiffs are entitled to a favorable result.

In the several cases which now comprise the record in the instant case, five witnesses, called on behalf of plaintiffs, testified on the question of commercial designation, while no proof on that issue was offered by defendant. The qualifications of said witnesses and the substance of the evidence given by them are hereinbelow summarized.

James A. Gruner has been engaged in the paper business since 1910. His entire business career has been spent in affiliation with the firm of Blake, Moffitt & Towne, a company known as a paper distributor which buys paper of all kinds from domestic papermills and sells it to the mill trade. This witness' principal position with the company has been in sales management, concerned with buying policies. He has also been regional division manager, and is presently consultant to the management. The company's sources of supply are located in the Pacific Northwest, around the Great Lakes region, in New England, and in the Southern States. Its sales are made in the States of Idaho, Washington, Oregon, California, Nevada, Arizona, Hawaii, and Alaska, and to the Federal Government, to all types of customers, including printers, publishers, users of wrapping paper, industrial concerns, retail shops, and some ultimate consumers. Generally speaking, the company deals in any line of paper for which there is a commercial demand.

\* \* \* We sell printing paper, book paper, cover paper, bond paper, writing paper, mimeograph paper, copy paper, ledger paper, just to name a few, and on the wrapping side, we sell wrapping paper, paper bags, paper cups, we sell paper converted products of all kinds, paper boxes, I think—in other words, we do a general wholesale paper business.

However, it appears that the company does not sell imported Japanese papers, although it handles domestic substitutes thereof; that it has sold only a limited quantity of what is known as dental paper; and that it does not handle asbestos paper, bakelite paper, diaphragm paper, or china paper, nor has it ever sold anything like the merchandise at bar, although some years ago a sample was sent in to the company to match, but "of course you can't match it as paper because it is not paper."

Mr. Gruner stated that during the course of his 50 years in the paper business, he has become familiar with the meaning of the term "paper" in the wholesale trade in the areas he has contacted; that such meaning was general and uniform, as well in June 1930 as at the present time, and referred to "a product that is formed by screening cellulose fibers through water solution or through a web which becomes paper"; and that the instant rice paper would not be covered by that definition "Because it is not made by the papermaking process. It has entirely different characteristics than paper for its normal usage. It is a different product."

Thomas Leddy has, for the past 2 years, been western representative of the Lee Paper Co., now Simpson-Lee Paper Co., a paper manufacturer. Prior to that, for a period of 30 years, commencing with 1928, he was employed in various capacities, including selling and management, by the Zellerbach Paper Co., a paper merchant, largest in the field, engaged in the business of buying and selling paper at wholesale. For 20 years, his activities have been confined to the seven Western States, but, in the past 10 years, he has dealt with mills and merchants throughout the country. He has seen paper manufactured many, many times and has learned the trade definition thereof which, to the best of his knowledge, has been uniform, definite, and constant throughout the years of his experience. According to this witness, "Paper is commonly used in the trade as being a matted material mostly cellulose, a felted or matted material mostly cellulose"; "fibers that come to the base material in the paper are crossed with each other, interlaced with each other instead of being all running in the same direction."

Mr. Leddy had not previously seen merchandise like the importation at bar. Upon being advised of the manner in which it is produced, he stated that it would not be embraced by the trade understanding of paper, because "there is no interlacing of the fibers." His testimony further shows that he has never handled bakelite paper, straw paper, diaphragm paper, or asbestos paper for insulating purposes.

Ralph Casper Erlandson is also affiliated with the firm of Blake, Moffitt & Towne. He has been in the wholesale paper business since 1907, when he was employed by Wright, Barrett & Stilwell of St. Paul, Minn. In 1912, he went with Blake, Moffitt & Towne and was assigned to Los Angeles. He has personally handled printing paper, cover paper, writing paper, and copy paper, but not asbestos paper, bakelite paper, diaphragm paper, or rice paper of any kind. He has purchased paper from mills "up and down the Atlantic Seaboard and into Wisconsin and the Ohio Valley" and has sold it in St. Paul and in Los Angeles. In his opinion, limited to the types of articles in which he has dealt, there is, and has been since prior to June 1930,

a general and uniform meaning of the term "paper" in the wholesale trade, which expresses the following:

* * * You start out with fibers and cellulose as it is over a paper machine, about 90 per cent water, and after it reaches the end of the screen the water is taken out, the fibers are crossed and matted, and from then on as it goes on the driers it is considered a sheet of paper.

Measured by these terms, the imported material would not, in Mr. Erlandson's opinion, be considered to be paper, because the fibers are not formed and crossed, and, as a matter of fact, because there are no fibers in it.

Richard S. Jones, who retired in June 1958 from the position of manager of the printing paper department of Zellerbach Paper Co., started in the paper business in 1919. His first experience was as a salesman in Omaha, Nebr., selling at wholesale to the printing trade. In 1923, he was transferred to Los Angeles, where he continued to sell to the wholesale trade. He has sold all types of printing paper, wrapping paper, covering paper, book paper, bond paper, copy paper—practically all paper, but not asbestos paper, bakelite paper, or diaphragm paper, and he had never seen merchandise like the present importations prior to the trial. At one time, the company was the agent for the Japan Paper Co. and handled Japanese paper, including a substance known as rice paper, but different from the merchandise at bar.

This witness stated his understanding of the uniform and general meaning of the term "paper" in the wholesale trade to be—

Fibers suspended in about 99 per cent water, matted together on a paper machine, comes off the end of the paper machine in a roll, and is sheeted as required.

This definition applied to all the paper he ever sold, and, by virtue of it, a substance such as the instant merchandise would not have been considered paper at any time throughout his experience, especially since it shows no fibers or strength.

Charles E. Canfield has been connected with the Canfield Paper Co. since 1923 and has been its president since 1946. This company is in the wholesale merchandising business, buying paper and reselling it to printers, consumers, photographers, and publishers, and Mr. Canfield is familiar with almost every phase of its operations. He started buying and selling paper in 1924. He has sold paper in New York and Philadelphia and has purchased it from almost all areas where it is manufactured, including the States of Maine, New Hampshire, Vermont, Massachusetts, New York, New Jersey, Delaware, Pennsylvania, Virginia, Wisconsin, Ohio, Michigan, Minnesota, and, possibly, Illinois. His experience has familiarized him with the commercial meaning of paper in the wholesale trade as of June 17, 1930, which meaning was definite, uniform, and general and which he under-

stands to be "a matted sheet of fibers which have been suspended in water and drained on to a screen and the water drained off from the screen leaving this matted sheet of fibers, which is usually cellulose fibers. It could be animal. In the paper business, it is almost all cellulose fibers from trees or rag but there are other fibers that are used too." Merchandise like the importations at bar would be excluded from that definition because it "is not made from a suspension of water which is my definition of paper." Although he has not dealt in such material, he has seen it often. He examined a sheet under a microscope and found that it shows a collection of cells, but no fiber.

Mr. Canfield was read the following definition of "rice paper" from the Dictionary of Paper, published by the American Paper and Pulp Association:

A paper made from the pith of a small tree (*Aralia papyrifera*) which grows in the swampy forests of Formosa. The cylindrical case of pith is rolled on a hard flat surface against a knife, by which it is cut into thin sheets of a fine ivory-like texture. Dyed in various colors, rice paper is extensively used for the preparation of artificial flowers; the white sheets are employed by native artists for water-color drawings.

He stated that he was familiar with the Dictionary of Paper, and with this definition, and that he agrees with the definition, except insofar as it describes "rice paper" as paper. He would change the word "paper" to a "paper-like substance" and stated that the Dictionary of Paper would be so revised in its next edition.

Counsel for plaintiffs contend that the effect of the cumulative testimony of their five witnesses is to show a definite, uniform, and general meaning of the term "paper" in the trade and commerce of the United States, which differs from its common meaning, to the extent that it does not apply to any substance which is not made of fibers matted from a water suspension. And, inasmuch as the imported merchandise does not conform to this description, it is urged that it may not properly be classified as paper.

The quality of the evidence is attacked by counsel for the defendant on a twofold basis. First, it is argued that the definition of paper supplied by the several witnesses does not differ from the generally accepted meaning of the term, as applied to the more common varieties of paper. Secondly, it is contended that the evidence lacks probative value, since the witnesses were not familiar with such specialized types of paper as asbestos, bakelite, and diaphragm papers, nor with the imported material, and their experience was not shown to include papers used in the manufacture of artificial flowers.

Although proof of commercial designation imposes a very onerous burden on a party who invokes the rule and is "a thing often claimed in customs litigation and rarely established" (*Jas. Akeroyd & Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 440, T.D. 42641), we are

inclined to the view that it has been affirmatively shown here. The witnesses for the plaintiffs were men with impressive backgrounds in the domestic paper industry, whose combined experience with the purchase and sale of that commodity spanned the nation over a period of years long prior to the enactment of the Tariff Act of 1930. They were clearly in a position to know whether in their industry the term had a specialized meaning and were most emphatic that it did. While it is true that the definitions which they supplied would normally embrace most classes of paper under the meaning of the word, as generally defined by the lexicons, to the extent that common meaning, as judicially found, includes rice paper made from the pith of the *Aralia papyrifera* plant, and the commercial meaning, as stated by these witnesses, did not, a difference between the two exists. Their testimony that the commercial meaning was well understood in all areas of the United States where paper is bought and sold at wholesale has not been controverted nor impugned. Neither do we consider that it has been weakened by the fact that the witnesses have not handled some few types of paper and were, for the most part, completely unfamiliar with the merchandise at bar.

In the case of *United States* v. *Georgia Pulp and Paper Manufacturing Co.*, 3 Ct. Cust. Appls. 410, T.D. 32998, the circumstance that witnesses, testifying on the commercial meaning of the tariff term "machine tools," had not made, sold, or handled machines of the type in issue, did not militate against a finding of a commercial designation excluding the importations from the scope of the provision.

What is important here is that the evidence shows a well-understood meaning in the paper trade which restricts the term "paper" to products made in accordance with a general process of matting fibers, usually of cellulose, from a water suspension. That the instant merchandise was not so produced is not disputed. That it would not have been recognized as paper in the trade and commerce of the United States at and prior to June 17, 1930, has been established. Accordingly, we find that "rice paper" of the kind involved in these cases is not paper within the contemplation of paragraph 1409, *supra*, when construed according to commercial designation.

Since the record in the incorporated case, as set forth in our decision (*Floral Arts Studio et al.* v. *United States*, 39 Cust. Ct. 287, C.D. 1943), also shows that the material from which this "rice paper" is made is pith, not wood, and that it has been advanced beyond the stage of a vegetable substance, crude or unmanufactured, we find no provision in the tariff act which more specifically provides for this substance than the general provision for unenumerated manufactured articles in paragraph 1558, as modified, *supra*. The claim in the protests for classification in said paragraph with the consequent assessment of duty at the rate of 10 per centum ad valorem is, therefore, sustained.

Judgment will be entered accordingly.